AO 91 (Rev. 11/11)  Criminal Complaint

| LODGED | |
|---|---|
| CLERK, U.S. DISTRICT COURT | |
| 7/16/2021 | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ LM _____ DEPUTY | |

# UNITED STATES DISTRICT COURT
### for the
### Central District of California ▾

| FILED | |
|---|---|
| CLERK, U.S. DISTRICT COURT | |
| July 16, 2021 | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ KC _____ DEPUTY | |

United States of America )
v. )
)
TYLOR BRITTEN MURRAY )
)
)
)

Case No.

5:21-mj-00481

_____
                    Defendant(s)

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____June 29, 2021____ in the county of ____Riverside____ in the
____Central____ District of ____California____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distributing 50 Grams or More of Methamphetamine |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Krista L. Gonzalez, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ____July 16, 2021____

_____
*Judge's signature*

City and state: ____Riverside, California____          Honoralbe Sheri Pym, Magistrate Judge
                                                        _____
                                                        *Printed name and title*

*AUSA:* John A. Balla

## AFFIDAVIT

I, Krista L. Gonzalez, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search the residence of Tylor MURRAY ("MURRAY") and Hector MAYORGA ("MAYORGA"), located at 1040 E. Deepak Road, Palm Springs, California (the "SUBJECT PREMISES"), MURRAY's vehicle, a 2015 grey Jeep bearing California license plate 7MPV610 ("SUBJECT VEHICLE 1"), MAYORGA's vehicle, a 2003 silver Lexus bearing California license plate 5HFT081 ("SUBJECT VEHICLE 2"), and MAYORGA's person, to seize any evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession of Controlled Substances with Intent to Distribute), 21 U.S.C. § 843(b) (Use of a Communication Facility to Facilitate Drug Trafficking), and 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms Without a License) (collectively, the "SUBJECT OFFENSES") committed by MURRAY and/or MAYORGA.

2.    This affidavit is also made in support of a criminal complaint and arrest warrant against MURRAY for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distributing 50 Grams or More of Methamphetamine) on June 29, 2021.

3.    The SUBJECT PREMISES is more specifically described in Attachment A-1 to the search warrant application.  The list of items to be seized is set forth in Attachment B to the search warrant application.

4.    SUBJECT VEHICLE 1 is more specifically described in Attachment A-2 to the search warrant application.  The list of items to be seized is set forth in Attachment B to the search warrant application.

5.    SUBJECT VEHICLE 2 is more specifically described in Attachment A-3 to the search warrant application.  The list of items to be seized is set forth in Attachment B to the search warrant application.

6.    MAYORGA is more specifically described in Attachment A-4 to the search warrant application.  The list of items to be seized is set forth in Attachment B to the search warrant application.

7.    Attachments A1, A-2, A-3, A-4, and B are incorporated herein by reference.

8.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or the investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## BACKGROUND OF AFFIANT

9.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") with the Los Angeles Division, Palm Springs Resident Agency in Palm Springs, California, where my

duties include the investigation of violent crimes and gangs.  I have been employed as an SA with the FBI since January 2020.

10.  I graduated from the FBI Academy located in Quantico, Virginia, in September 2020 and received approximately 840 hours of instruction in the fundamentals of law, ethics, behavioral science, interviewing, report writing, firearms, surveillance, defensive tactics and case management.  During my tenure as an FBI SA, I have participated in a variety of investigations including drug trafficking, felon in possession of firearms and/or ammunition, violent crimes, bank robberies, bank fraud, wire fraud, and crimes against children.

11.  As an SA, I have received training in the identification, collection, and preservation of evidence, photography, latent print collection, and crime scene investigations.  I have also completed many hours of criminal investigations, including compiling information, interviewing victims, witnesses, and subjects, and collecting evidence to support the filing of criminal complaints and search warrants. During the course of my investigations, I have interviewed witnesses, conducted surveillance, participated in execution of arrest and search warrants, and reviewed various forms of evidence including telephone call detail records, bank records, invoices, photographs, recorded telephone calls, and other miscellaneous financial documents.  Through my training and experience as an SA and the collective experiences related to me by other law enforcement officers, I have become familiar with drug and firearm trafficking and the SUBJECT OFFENSES.

## SUMMARY OF PROBABLE CAUSE

12.   FBI began investigating MURRAY for firearm and drug trafficking after Riverside County Gang Task Force ("GTF") officers executed a search warrant at the property where MURRAY previously lived in February 2021.  The warrant related to Robert Lorenzo Lee Ramos, whom GTF suspected of dealing drugs and possessing firearms as a felon.  Officers found numerous kinds of drugs and firearms in Ramos's car and trailer on the property.  The property contained multiple structures, and officers also found drugs and gun-fabricating equipment in MURRAY's home.

13.   Ramos was indicted in the United States District Court for the Central District of California for firearm and drug charges related to the items found.  While investigating Ramos before indictment, I obtained search warrants for his Facebook and Instagram accounts.  The data on those accounts showed numerous messages between Ramos and MURRAY related to drug and firearm trafficking.

14.   In May 2021, United States Customs and Border Protection ("CBP") officers seized suspected methamphetamine and fentanyl from a car driven by E.L.[1] at an immigration checkpoint. During a recorded interview, E.L. said that she was delivering the drugs to MAYORGA at the SUBJECT PREMISES as she had done on previous occasions.  She stated that MAYORGA lived at the SUBJECT PREMISES with MURRAY.  She also said that she had seen

---

[1] Law enforcement knows the names of everyone identified herein by initials, but I have abbreviated their names for their safety and privacy.

firearms, firearm parts, and methamphetamine in MURRAY's bedroom at the SUBJECT PREMISES.

15.   In June 2021, law enforcement surveilled MAYORGA. They saw him drive to the SUBJECT PREMISES using SUBJECT VEHICLE 2 from a casino.  Based on details in E.L.'s statement about MAYORGA's drug trafficking and the travel pattern surrounding his trip from the border to the SUBJECT PREMISE, I believe he was restocking his drug supply to distribute drugs to co-conspirators.

16.   In June and July 2021, law enforcement used a confidential human source ("CHS") to purchase firearms and drugs from MURRAY in three separate controlled buys.  During each buy, surveilling officers saw MURRAY leave the SUBJECT PREMISES in SUBJECT VEHICLE 1 and meet the CHS at different locations where the deals occurred.  In one of the deals, MURRAY and others used both SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 to complete a firearm controlled buy.

## IV. STATEMENT OF PROBABLE CAUSE

17.   During the course of this investigation, I reviewed law enforcement reports, state search warrant affidavits, body worn camera footage from Deputy Sean Budnick of Riverside County Sheriff's Department, and I have spoken with other law enforcement officers involved in the investigation, and learned the following:

**Background of Riverside County Sheriff Department Investigation involving Robert Lorenzo Lee Ramos**

18.   On April 5, 2021, United States Magistrate Judge Kenly Kiya Kato signed and issued an arrest warrant for Ramos and a search warrant for Ramos's Facebook and Instagram accounts in case numbers 5:21-MJ-248 and 249.  ~~I have attached my affidavit in support of those warrants as Exhibit 1, and I incorporate it here by reference.~~

19.   On June 24, 2021, United States Magistrate Judge Sheri Pym signed and issued a search warrant for MURRAY's Facebook and Instagram accounts in case number 5:21-MJ-438.  ~~I have attached my affidavit in support of that warrant as Exhibit 2, and I incorporate it here by reference.~~

**Border Patrol Stop and Investigation of E.L. on May 18, 2021**

20.   On May 18, 2021, at approximately 7:35 a.m., CBP Agent Juan Broderick inspected a car driven by E.L. at an immigration checkpoint on Highway 86 near Indio, California.  E.L. told Agent Broderick that she was coming from Calipatria, California, to go to Desert Hot Springs, California.  Agent Broderick sent the vehicle to secondary inspection after a K9 alerted on the driver's side and rear end of the vehicle.  The vehicle was also found to be reported stolen.

21.   After E.L. gave verbal consent to search the vehicle, CBP located two bundles wrapped in black electrical tape wedged between the battery and engine component of the vehicle.  E.L. was brought inside the checkpoint where she freely handed over a bag containing a white crystalline substance and a small bundle

containing blue pills imprinted with "M" and "30."  CBP field-
tested part of the substance in the engine compartment and part
of the substance in the bag E.L. handed over, and they tested
presumptive positive for methamphetamine.  CBP field-tested the
bag of blue pills imprinted with "M" and "30," and they tested
presumptive positive for fentanyl.  The total weight of the
methamphetamine was 2.44 pounds with a value of $6,588. The
total weight of the fentanyl pills was .36 pounds with a value
of $11,520.

    22.  I reviewed the recorded interview with E.L. and CBP
Agent Castaneda from the day she was stopped at the checkpoint.

        a)   During that interview, E.L. said that around
midnight on May 17, 2021, she borrowed a car from a friend to go
visit another friend named Mari.  Her main reason for the visit
was to pick up the drugs found in E.L.'s car and take them back
to Deepak Road in Palm Springs, California, to deliver them to
MAYORGA for $800.  E.L. stated that she has done this before on
three or four occasions, but in different vehicles.  On all of
her previous trips, she delivered the drugs back to Deepak Road
and gave them to MAYORGA.

        b)   On the late evening of May 17, 2021, E.L. was
instructed to drive to a hotel to pick up drugs.  On May 18,
2021, E.L. went to room 12 of the Calipatria Inn located at 700
N. Sorensen Avenue, Calipatria, California, and waited inside of
the room.  After a while, an unknown male told her that her car
was loaded and ready to go.  E.L. got back into her car and

drove back towards Palm Springs where she was stopped at the checkpoint.

23.  On June 1, 2021, I interviewed E.L. at the FBI Palm Springs Resident Agency.

a)  E.L. revealed that she had court on the morning of June 1, 2021 in Indio, California.  E.L. took an Uber to MURRAY's house, located at the SUBJECT PREMISES, around 6:30 a.m. to get ready for court. On the morning of June 1, 2021, MURRAY and J.B. took E.L. to and from court driving MURRAY's grey Jeep Rubicon (presumably SUBJECT VEHICLE 1).

b)  On May 17, 2021, at approximately 10:00-11:00 p.m., E.L. met G.G., G.G.'s girlfriend, and an unknown male ("UM") at a friend's house in Desert Hot Springs, California. G.G. told E.L. to drive to the Border Motel in Calexico with the unknown male to pick up drugs.  E.L. believed the UM was sent to drive with her on behalf of MAYORGA. Based on my training and experience, drug traffickers use female drivers to appear less suspicious among law enforcement.  E.L. and the UM drove to the Border Motel located at 120 E. Fourth Street, Calexico, California, and E.L. checked into the motel under her name. E.L. sat in the room, took a nap, and played on her phone until the UM told E.L. the car was ready to go around 4:00 a.m. on May 18, 2021.

c)  Around 7:00 a.m., E.L. was stopped by CBP where they located methamphetamine and fentanyl.  E.L. was interviewed, cited, and released.  E.L. revealed she was supposed to deliver the drugs to MAYORGA at the SUBJECT

PREMISES.  Additionally, E.L. revealed MAYORGA has a house in Mexico and has a lot of people working with him.  Based on my training and experience, many different drugs come from Mexico, through the border and into the United States.  The value of drugs significantly increases once they are crossed over the border and the further the drugs travel away from the border.

d)    E.L.'s sister, A.L., is dating MAYORGA and living with MAYORGA at MURRAY's home located at the SUBJECT PREMISES.  E.L. revealed MAYORGA and A.L. drive a Lexus.  E.L. revealed she has transported a load of drugs for MAYORGA twice before; once in November 2020 and once in March 2021.  Both times, she drove with M.M., MAYORGA's brother, inside of M.M.'s BMW or Honda.

e)    On May 31, 2021, E.L. visited MURRAY at the SUBJECT PREMISES and saw firearms in MURRAY's closet inside of his bedroom.  She said that MURRAY orders firearm parts and builds them at his house.[2]  MURRAY kept the firearms, jewelry, and other valuables within the closet inside of his bedroom bathroom.  MURRAY had a keypad lock[3] on both his bedroom door and closet door.  In addition to firearms, E.L. had seen methamphetamine in MURRAY's closet.  During the week of May 24,

---

[2] On June 8, 2021, ATF SA Valerie Atwood confirmed that MURRAY does not hold a federal license to deal firearms, nor does he have any such application pending.

[3] The office that was searched on February 3, 2021, as a part of the search warrant related to Ramos, had a keypad lock attached to the door. Interviews with occupants of the property search on February 3, 2021 revealed that MURRAY and his father-in-law were the only people with access to the office and the combination to the keypad.

2021, to May 30, 2021, E.L. had seen a firearm inside of the
glove box of his grey Jeep (presumably SUBJECT VEHICLE 1).

       f)  E.L. believed MAYORGA supplied drugs to MURRAY.
E.L. revealed that MAYORGA sells blue pills and methamphetamine
and typically keeps his supply within his room inside of his
closet at the SUBJECT PREMISES.  E.L. revealed that MAYORGA does
a weekly run to Mexico to re-up his supply of drugs and then
transport the drugs back to Palm Springs to distribute the drugs
to other co-conspirators.  Typically, MAYORGA and A.L. go pick
up the load near Mexico together.  E.L. revealed that A.L. had
left the residence at the SUBJECT PREMISES during the early
morning of June 1, 2021 to pick up MAYORGA from a location near
the border in SUBJECT VEHICLE 2.

    24.  The day after my interview with E.L., on June 2, 2021,
at approximately 10:27 a.m., CBP Agent Castaneda learned that
SUBJECT VEHICLE 2 had crossed a license plate reader located in
West Moreland, California, and was anticipated to pass the
Highway 86 Checkpoint located near Indio, California.  At
approximately 11:11 a.m., CBP Agent Mike Carpenter located
SUBJECT VEHICLE 2 driving northbound on Highway 86 towards
Dillon Road in Coachella and began following it.  At
approximately 11:14 a.m., SUBJECT VEHICLE 2 parked at Fantasy
Springs Casino in Indio, California.  At approximately 11:20
a.m., CBP agents saw MAYORGA, A.L., and R.N. exit SUBJECT
VEHCILE 2.  At approximately 12:38 p.m., the three individuals
re-enter SUBJECT VEHICLE 2.  At approximately 1:07 p.m., SUBJECT
VEHICLE 2 arrived at the SUBJECT PREMISES.  Surveillance units

also saw a black Toyota Camry registered to R.N. at the SUBJECT
PREMISES.

25.  On June 4, 2021, I reviewed surveillance photos of
Fantasy Springs Casino which showed that SUBJECT VEHICLE 2
arrived at the casino and was occupied by two males and one
female.  Security footage from Fantasy Springs Casino revealed
the three individuals walked around the casino and played slot
machines.  The two males talked with an unidentified male for 10
to 15 minutes before the two known males and one female left the
casino.

26.  Based on E.L.'s statement, the travel pattern of
SUBJECT VEHICLE 2, and Fantasy Springs Casino surveillance
photos, I believe that MAYORGA was on a trip to re-up his drug
supply from the border to store the drugs and then distribute
them to other co-conspirators.

27.  On June 21, 2021, I asked CBP Agent Carpenter to
provide the border crossing records for SUBJECT VEHILCE 2.  The
query revealed that the vehicle had crossed the Calexico port of
entry inbound on June 8, 2021 at approximately 12:15 a.m.  The
occupants were MAYORGA, A.L., and P.S.  The query also revealed
that the vehicle had crossed at the Calexico port of entry
outbound on June 13, 2021, and returned through Calexico inbound
on June 14, 2021.  The occupants were MAYORGA, R.N., A.L., and
P.S.[4]

---

[4] Here and in the controlled buys discussed below,
surveilling agents had reviewed records such as driver's license
photos for the individuals involved.  Unless noted otherwise,
surveilling agents identified the participants by comparing
their observations with those photos.

**Controlled buy of two firearms and ammunition from MURRAY on June 15, 2021**

28.  On June 15, 2021, a CHS conducted a controlled buy[5] of one Bryco 38 .380 semi-automatic pistol bearing serial number 12992593 with one magazine, one AR Pistol (one lower receiver and one upper receiver known as a ghost gun[6]) with one magazine, and 16 rounds of live ammunition including 11 rounds of Federal Auto 380 ammunition, one round of Winchester 5.56 ammunition, and five rounds of Remington 223 ammunition, for $2,250 from MURRAY.

29.  At approximately 8:20 p.m. on June 15, 2021, the CHS contacted MURRAY on phone number 760-799-2960 inquiring about a firearm purchase.  MURRAY told the CHS to meet MURRAY at the Agua Caliente Resort Casino and Spa in Rancho Mirage, California.  Law enforcement surveillance units established surveillance near Agua Caliente and at the SUBJECT PREMISES in preparation for the controlled buy between the CHS and MURRAY.

30.  At approximately 8:34 p.m., surveillance saw SUBJECT VEHICLE 1's headlights turn on and leave the SUBJECT PREMISES

_____

[5] Any reference to "controlled buy" means that a law enforcement officer searched the CHS and any vehicle used for the buy before the buy occurred and found no contraband or cash other than what was provided by the officer, that the CHS was monitored via surveillance and transmitting/recording device during the transaction, and that the CHS and any vehicle was searched by a law enforcement officer after the transaction where no extra cash or contraband other than that involved in the deal was found.

[6] A search on www.bradyunited.org revealed that a ghost gun is an unregulated firearm that anyone, including minors and prohibited persons, can buy and build without a background check. Ghost guns are un-serialized and untraceable firearms that can be bought online and assembled at home.

followed by SUBJECT VEHICLE 2.  At approximately 9:07 p.m., the CHS arrived at Agua Caliente.  The CHS parked in the back parking lot and walked through the rear entrance.  At approximately 9:12 p.m., the CHS, MURRAY, and a Hispanic male adult (later identified as R.N.) met past the bar.  At approximately 9:26 p.m., surveillance units saw the CHS, MURRAY, and R.N. exit the casino and enter SUBJECT VEHICLE 1.  At approximately 9:33 p.m., MURRAY dropped the CHS off at his vehicle and told CHS to follow him to the gas station across the street.

31.  Surveillance units established surveillance near the Best Western Plus Desert View Inn and Suites in Cathedral City, California, in preparation for the controlled buy between the CHS and MURRAY.  At approximately 9:37 p.m., the CHS met MURRAY in the back of the ARCO gas station in Cathedral City, California, and the CHS got into the passenger seat of SUBJECT VEHICLE 1.  SUBJECT VEHICLE 2 was parked next to SUBJECT VEHICLE 1, and R.N. was sitting in the driver's seat.  MURRAY retrieved a bag from the trunk or back seat of SUBJECT VEHICLE 2 and got back into the driver's seat of SUBJECT VEHICLE 1.  The CHS was equipped with a recording and transmitting device and agents were able to hear the conversation between MURRAY and the CHS.  During the controlled buy, agents were able to hear the CHS count the money to MURRAY for the two firearms.  At approximately 9:43 p.m., surveillance units saw SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 leave the parking lot, but surveillance units did not follow.  At approximately 9:56 p.m., surveillance

13

units saw SUBJECT VEHICLE 1 return to the SUBJECT PREMISES.
MURRAY was the only occupant of SUBJECT VEHICLE 1.  At
approximately 9:57 p.m., surveillance units saw SUBJECT VEHICLE
2 return to the SUBJECT PREMISES.  R.N. was the only occupant of
SUBJECT VEHICLE 2.

     32.  After conducting the controlled buy with MURRAY, the
CHS left the parking lot and proceeded to a pre-determined
location to meet with agents while under constant surveillance.
Once at the location, the CHS provided agents with one black gym
bag containing one Bryco 38 .380 bearing serial 1292593 with one
magazine inserted, one un-serialized AR pistol (one lower
receiver and one upper receiver) with one magazine inserted, and
one jewelry bag containing 16 rounds of live ammunition
including 11 rounds of Federal Auto 380 ammunition, one round of
Winchester 17 5.56 ammunition and five rounds of Remington 223
ammunition.

     33.  On June 16, 2021, I showed the CHS the California
Department of Motor Vehicles driver's license photo of R.N.  The
CHS positively identified R.N. as the Hispanic male adult that
accompanied MURRAY to Aqua Caliente and as the driver of SUBJECT
VEHICLE 2 the day before when the CHS purchased the two firearms
from MURRAY.

**Controlled buy of 1,000 M-30 blue pills from MURRAY on June 23,
2021**

     34.  On June 23, 2021, a CHS conducted a controlled buy of
1,000 M-30 blue pills for $3,000 from MURRAY.

35.   At approximately 6:22 p.m. on June 23, 2021, the CHS contacted MURRAY on phone number 760-799-2960 and inquired about buying fentanyl pills.   MURRAY told the CHS that he was waiting on 600 more pills to complete the transaction.   MURRAY told the CHS they would meet at an AMPM/ARCO gas station in Palm Springs around 7:30 p.m.   Surveillance units established surveillance around the AMPM/Arco and at the SUBJECT PREMISES in preparation for the controlled buy between the CHS and MURRAY.

36.   At approximately 7:31 p.m., SUBJECT VEHICLE 1 turned on and left the SUBJECT PREMISES.   While under constant surveillance, at approximately 7:37 p.m., surveillance units saw SUBJECT VEHICLE 1 enter a Marshall's parking lot in Palm Desert, California, and park next to a burgundy Dodge Charger. Surveillance units saw MURRAY meet with a female who was inside of the Dodge Charger.   At approximately 7:39 p.m., surveillance units saw SUBJECT VEHICLE 1 exit the parking lot.   At approximately 7:43 p.m., MURRAY sent the CHS a text message and to let the CHS know he was going to go back to his home and count the pills, then they would meet for the transaction. Based on this conversation, I believe that MURRAY was supplied the additional 600 M-30 pills by the unidentified female driving the burgundy Dodge Charger.

37.   At approximately 7:52 p.m., surveillance units saw SUBJECT VEHICLE 1 return to the SUBJECT PREMISES.   MURRAY was the only occupant of SUBJECT VEHICLE 1.   At approximately 8:01

p.m., MURRAY sent the CHS a text message to meet at Sunrise and Vista Chino smoke shop[7] next to Stater Bros at 8:10 p.m.

38.  At approximately 8:23 p.m., surveillance saw SUBJECT VEHICLE 1 turn on and leave the SUBJECT PREMISES and arrive at Tobacco Discount No 4 parking lot.  Surveillance units saw MURRAY exit SUBJECT VEHICLE 1 and enter the Tobacco Discount No 4 shop.  At approximately 8:27 p.m., the CHS arrived at the Tobacco Discount No 4 parking lot, parked, and then entered the passenger side of SUBJECT VEHICLE 1.  MURRAY entered the driver's side of SUBJECT VEHICLE 1 and drove to the Taco Bell drive-thru located in the same shopping plaza.  While in the drive-thru, MURRAY and the CHS completed the transaction of the 1,000 M-30 pills.  The CHS was equipped with a recording and transmitting device and agents were able to hear the conversation between MURRAY and the CHS.  During the controlled buy, agents were able to hear the CHS give the money to MURRAY for the 1,000 M-30 pills.

39.  At approximately 8:39 p.m., surveillance units saw MURRAY drive the CHS back to the smoke shop where the CHS and MURRAY parted ways.  At approximately 8:41 p.m., SUBJECT VEHICLE 1 left the parking lot.  While under constant surveillance, units saw SUBJECT VEHICLE 1 return to the SUBJECT PREMISES at approximately 8:44 p.m.  MURRAY was the only occupant of SUBJECT VEHICLE 1.

---

[7] A query on Google Maps revealed that the smoke shop located next to the Stater Bros at 1717 Vista Chino is called Tobacco Discount No 4.

40.   After conducting the controlled buy with MURRAY, the CHS left the parking lot and proceeded to a pre-determined location to meet with agents while under constant surveillance. Once at the location, the CHS gave agents one black cloth bag containing 10 plastic bags with an unknown number[8] of M-30 blue pills.[9]

**Controlled buy of one pound of Methamphetamine and two firearms from MURRAY on June 29, 2021**

41.   On June 29, 2021, a CHS conducted a controlled buy of one pound of methamphetamine, two Polymer80 Glock 17 ghost guns and 14 rounds of live ammunition for $3,500 from MURRAY.

42.   At approximately 7:22 p.m. on June 29, 2021, MURRAY sent a text message to the CHS using the phone number 760-799-2960 about a firearm and drug sale.  MURRAY told the CHS that he had two Glock 17 firearms ready to sell and could meet around 9:00 p.m.  Following the text message, MURRAY sent a message to the CHS using the social media application Telegram[10] and told the CHS that the firearms would be $2,000 total.  They also

---

[8] Due to a recent trend seen in other cases throughout the Coachella Valley, M-30 pills are likely laced with fentanyl. The pills were not removed from the bags and hand counted for the safety of the agents.

[9] On June 30, 2021, I sent the drug evidence to the DEA laboratory for examination. As of the signing of this affidavit, I have not received results from the DEA laboratory.  In my training and experience, though, and consistent with the pills seized from E.L. outlined above, M-30 pills are commonly counterfeit oxycodone pills laced with fentanyl.

[10] A query on www.telegram.org revealed that the application named Telegram is a free cloud-based mobile and desktop messaging application with a focus on security and speed.  In my experience, Telegram is a preferred messaging application for criminals because of its encryption and because the application does not retain messages.

discussed MURRAY selling the CHS a pound of methamphetamine.  At approximately 9:00 p.m., MURRAY sent the CHS a text message to meet at a Taco Bell in Palm Springs, California.  Surveillance units established surveillance around the Taco Bell parking lot and at the SUBJECT PREMISES in preparation for the controlled buy between the CHS and MURRAY.

43.  At approximately 9:15 p.m., the CHS arrived at the Taco Bell.  At approximately 9:27 p.m., surveillance units saw MURRAY exit the SUBJECT PREMISES and enter a silver Mazda SUV bearing CALP 8VVE410.[11]  Surveillance units saw the silver Mazda turn on and leave the SUBJECT PREMISES.  At approximately 9:36 p.m., MURRAY sent the CHS a text message and asked where the CHS was parked.  At approximately 9:40 p.m., MURRAY sent the CHS a text message saying he arrived at the Taco Bell.  At approximately 9:42 p.m., the CHS entered the passenger side of the silver Mazda.  The silver Mazda drove to the AMPM/Arco gas station through the parking lot, then onto Vista Chino driving eastbound, and returned to the Taco Bell parking lot while conducting the transaction.  The CHS was equipped with a recording and transmitting device and agents were able to hear the conversation between MURRAY and the CHS.  During the controlled buy, agents were able to hear the CHS give the money to MURRAY for the two firearms and one pound of methamphetamine.

---

[11] Per Department of Motor Vehicles records, the Mazda is registered to EAN Holdings LLC. A query to Enterprise Rent-A-Car revealed that MAYORGA rented the vehicle from the Palm Springs Airport on June 23, 2021.

44.  At approximately 9:44 p.m., the silver Mazda left the parking lot.  Surveillance units saw the silver Mazda return to the SUBJECT PREMISES at approximately 9:47 p.m.  MURRAY was the only occupant of the silver Mazda.

45.  After conducting the controlled buy with MURRAY, the CHS departed the parking lot and proceeded to a post-determined location to meet with agents.  Once at the location, the CHS provided agents with one clear plastic bag that was wrapped in duct tape containing suspected methamphetamine[12] and one black shoe box containing one plastic bag containing 14 rounds of ammunition and two black Polymer80 Glock 17 ghost guns with magazines.

### TRAINING AND EXPERIENCE ON DRUG OFFENSES

46.  Based on my training, experience, and consultation with other law enforcement officers, I know persons involved in the transportation, distribution, purchase, sale, and/or use of illegal drugs often use vague or ambiguous terms to describe controlled substances.

47.  Drug distributors commonly have in their possession (that is, on their person, at their residence, and in areas under their control) firearms, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, silencers, and other weapons.  Such firearms are used to protect

---

12 On June 29, 2021, SA Kim Vesling tested the suspected methamphetamine with a NARTEC Inc. test which revealed presumptive positive for methamphetamine.  On June 30, 2021, I sent the drug evidence to the DEA laboratory for examination. As of the signing of this affidavit, I have not received results from the DEA laboratory.

and secure drug distributors, their contraband, and property derived from drug distribution proceeds.  Such property may include, but is not limited to, drugs and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers, cellular phones, and quantities of currency related to their drug distributing activity.

48.  Drug distributors often have on hand large amounts of currency in order to maintain and finance their ongoing business.  It has been my experience that large-scale drug distributors often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles, and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances and/or analogues in their residence, vehicles, safes, storage containers, stash houses and in other areas under their control.

49.  Drug distributors maintain in their possession and at areas under their control fictitious identification, including, but not limited to, driver's licenses, employment cards, insurance cards, social security cards, naturalization records, certificates of birth, and passports which are obtained by the distributors and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activity.

50.   Drug distributors often utilize vehicles in which to transport and distribute controlled substances and/or analogues to facilitate their distributing activities.  Based on my training, background, experience, conversations with other law enforcement officers, and the knowledge I have gained through this investigation, I also know that distributors will also utilize vehicles as locations in which to store controlled substances and/or analogues prior to distribution.  Individuals who manufacture and/or distribute controlled substances and/or analogues commonly maintain books, records, receipts, notes, ledgers, and other papers relating to the expenses and procurement of material and equipment used to obtain controlled substances and/or analogues or to manufacture, transport, order, sell, or distribute them, even though such documents may be in code.  These books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug distributors have ready access to them, *i.e.*, homes, stash houses, offices, automobiles, and businesses.  Individuals who manufacture and/or distribute controlled substances and/or analogues commonly hide contraband, proceeds of drug sales, and records of transactions, drug sources, and drug customers in secure locations within their residences, offices, garages, storage buildings, stash houses, and safe deposit boxes, closed or locked out-buildings, carports, containers, such as file cabinets, safes, vaults, drawers, luggage, briefcases, valises, boxes, cans, bags, and trash bins in order to have ready access to such items and to

conceal such items from law enforcement authorities and other individuals who may steal from them.

51.   Individuals who manufacture and/or distribute controlled substances frequently take, or cause to be taken, photographs of themselves, their associates, their property, and their product, and often maintain these photographs in their residence or on cellular devices, or places under their control or where they frequent.  Often times, these photographs are taken with electronic devices, including cellular phones and tablets.

52.   Articles of personal property, such as personal identification, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, rent receipts, addressed envelopes, bills, keys, personal telephone and address books, unexposed film, video tapes, and video cassette boxes, are essential to establish the identities of individuals in control or possession of the premises, residences, vehicles, storage areas, and containers being searched.

53.   Individuals involved in the possession, manufacture and/or distribution of controlled substances will often use cellular telephones to further their criminal activity and maintain telephone bills which reflect their calls which facilitate the distribution of controlled substances and/or analogues.  By answering telephones and returning calls, co-conspirators have been identified and additional controlled substances and/or analogues have been seized.

54.   Individuals who manufacture and/or distribute controlled substances often travel, sometimes great distances, in order to acquire controlled substances and/or analogues or materials and equipment to manufacture controlled substances and/or analogues.  Records of their travels are often found at their businesses, at their residences, in their vehicles, and stash houses.  Further, drug distributors sometimes maintain communications, records, information, property and/or documentation relating to their drug activity.  The terms "communication," "records," "information," or "property" includes all of the foregoing items of evidence in whatever form and by whatever means that may have been created or stored, including records, whether stored on paper or on memory storage devices such as thumb drives, flash drives, and hard drives, programmable instruments such as telephones, "electronic address books," calculators, or any other storage media, or any other form of "writing", together with indicia of use, ownership, possession, or control of such "records," "information," and "property."

55.   Individuals involved in manufacturing and/or distributing controlled substances will often conceal, store and transport controlled substances or materials used to manufacture controlled substances and/or analogues in vehicles under their control and vehicles under the control of their associates. Often times, therefore, such individuals will have several vehicles located on their premises. Additionally, individuals involved in manufacturing and/or distributing controlled

substances will utilize vehicles that are registered and maintained by other associates to further evade law enforcement to the location and or identification of the drug trafficker. Some of these vehicles are often in various states of repair, ranging from total abandonment and non-drivable to brand new. When checking with the Department of Motor Vehicles, agents and law enforcement officers will often find that such vehicles are registered in the name of other individuals. This is often the result of such individuals' attempts to insulate themselves should the vehicles be found containing drugs or other contraband. Based on my training, background, experience, conversations with other law enforcement officers, and the knowledge I have gained through this investigation, I believe that searching vehicles present at the residences, stash houses, or places of business of such individuals and found to be under their control (as evidenced by possession of keys or paperwork indicating they have access to the vehicle) during the service of the search warrant may produce relevant evidence. Likewise, as the individual identified above appears to work primarily from home and is required to utilize his vehicles in order to travel to the various business locations, documents such as business documents, inventory lists, customer lists, sales information, profit information, invoices, shipping labels, receipts, cancelled checks, bank records, supplier lists and other evidence of sales of an ongoing criminal conspiracy, may be found in the vehicles.

56.  When individuals are involved in a distribution and manufacturing conspiracy, it aids the investigation to determine the financial status of the conspirators for a period of time before the illegal activity was known to first commence.  The difference in earnings will help to establish the monies earned through the illegal activity.  This type of information is often found on bank statements, income reports, daily sales reports, personal and business tax returns, profit/loss reports, check registers, credit card statements, and computer or other digital storage devices.

57.  The types of evidence enumerated in Attachment B to each requested warrant, attached hereto and incorporated herein by reference, have often been recovered at the residence or place of business of drug distributors and, in addition, from other structures and areas on the property being searched, as for example, other storage lockers/areas, detached closets, containers, and yard areas associated with the main residence and used in connection with or within the curtilage of said residence.

58.  Based on my training and experience, I am aware that drug dealers will often use cellular phones to facilitate their drug dealing business.  A cellular telephone is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A cellular telephone usually contains a "call log," which records

the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device. In my experience as an investigator working drug-related investigations, I am aware that text messages and phone calls made from cellular phones are made by drug dealers to arrange meeting locations and times, negotiate prices and quantities, and discuss the quality of the substance. The list of contacts contained in the cell phone often contains the names of buyers and suppliers. The stored memory of the phone often contains images of contraband and money.

### TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

59. Based on my training, experience, conversations with other law enforcement personnel, as well as my personal knowledge of this investigation, I know that drug traffickers often arm themselves with rifles, pistols, shotguns and other dangerous weaponry. These weapons are used as a means of protection.

60.  I know through my training and experience that drug traffickers it is common practice for drug traffickers to hide their weaponry and other evidence of their criminal activity at their homes, storage facilities, safe houses, or relatives/friend's residences, and vehicles.  I also know that drug traffickers will hide weapons and other evidence of their criminal activities in various locations within their vehicles: the glove compartment, trunk, under seats, under the dashboard, in door panels, hidden compartments, storage compartments, and the engine compartment.

61.  Based on my training and experience working firearms-related investigations, those who traffic firearms and drugs will possess other firearms concealed in their residences, concealed in their vehicles, and concealed on their persons. Along with firearms, I am aware from searches I have conducted, as well as from speaking with other investigators, that items associated with firearms are often found during the search for illegally-possessed firearms.  These items include ammunition, ammo boxes, gun boxes, cleaning supplies, targets, and other items that tend to reveal firearms possession and ownership. These items can be useful in establishing probable cause that a subject was in possession of the firearm even if the firearm was recovered in a common area of the residence or vehicle.

## IV.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[13]

62.  In today's technological society mobile telephones are ubiquitous.  Based on my training, experience and the experience and training of other law enforcement officers with whom I have had discussions, I know mobile telephones are carried by suspects who commit all types of crimes.  In some cases, a suspect's mobile telephone is kept for personal use, and is only incidentally used to facilitate criminal activity.  In other cases, mobile telephones are kept by suspects for the primary use of facilitating criminal activity.  In either case, I know mobile telephones to be valuable containers of evidence.

63.  Suspects use mobile telephones to send and receive messages, telephone calls, videos and photographs to communicate with one another about their crimes.  During this investigation it was learned that MURRAY used his telephone to communicate with CHS during all three controlled buys. The controlled buy was only successful if MURRAY was able to communicate via text message or applications to inform the CHS about meeting locations and times, as well as inventory. Additionally, I know that suspects tend to keep their mobile telephones in their homes, vehicles and on their person.

---

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

64.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a)   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b)   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

29

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c)   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d)   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

65.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a)   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b)   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

66.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a)   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b)   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c)    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant:  depress MURRAY or MAYORGA's thumb- and/or fingers on the device(s); and hold the device(s) in front of MURRAY or MAYORGA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

67.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## <u>CONCLUSION</u>

68.  Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES, in SUBJECT VEHICLE 1, in SUJECT VEHICLE 2, and on MAYORGA's person.

69.  I also submit that there is probable cause to believe that MURRAY committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distributing 50 Grams or More of Methamphetamine) on June 29, 2021.

Attested to by the applicant,
<u>FBI SA Krista L. Gonzalez</u>, in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>16th</u> day of
<u>July</u>, 2021.

_____
UNITED STATES MAGISTRATE JUDGE